## SHOLES v. STATE.

No. A-11841.  July 29, 1953.

(260 P. 2d 440.)

Pierce & Pierce, Muskogee, and Cecil E. Robertson, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., and Ed A. Edmondson, Jr., County Atty., Muskogee County, Muskogee, for defendant in error.

POWELL, P. J. Augustus Sholes was charged in the district court of Muskogee county with the murder of Nathaniel Pannell, shown by the evidence to have been his second cousin. The jury found him guilty of manslaughter in the first degree, but being unable to agree upon the extent of punishment left this to the court, who assessed a penalty of twelve years confinement in the State Penitentiary.

Evidence offered by the defendant discloses that he is a Negro who served about nine months in World War I; that in 1952 he was 59 years of age and had been suffering from arthritis since in 1947, and was receiving compensation from the U. S. Government for total disability. He weighed but 120 pounds. The deceased was shown to have been over six feet tall, around 60 years of age, and had been a long-time friend of the defendant.

For reversal of his conviction, defendant sets out ten assignments of error, but in brief argues the alleged errors by number and in groups without specific heading.

The state to make out its case used four witnesses, two policemen, the sheriff and a physician, and introduced in evidence a written statement purportedly voluntarily made by the defendant to the officers following his arrest, and which was by an assistant county attorney reduced to writing and thereafter signed by the defendant.

Charles Hefner, policeman, testified that at about 5:15 p.m., March 3, 1952, he got a call to go to 1714½ Tamaroa street, Muskogee, and on arriving found a man lying in the yard near the front of that numbered house, and with blood oozing out of his head under the edge of the hair line. His head was to the southwest and his feet toward the front of the house. They found no weapons or firearms lying around the body. Witness further testified that the house was a "shot gun" type house with a string of three rooms. The officers went to the rear end of this house and entered a two-room apartment and found lying in the corner of the northwest room a .22 caliber Winchester pump-action rifle, with an empty shell in the chamber and a loaded shell in the magazine. This rifle was identified by the witness and admitted in evidence. A colored woman, Mabel Sholes, was sitting on the side of a bed. They could not find her husband, Augustus Sholes. Witness testified that later Officers Clayton and Parks returned and arrested the defendant and witness was present at the police station when they first questioned him. Witness on cross-examination testified that he learned that the deceased lived in the front room of the three-room house, and that there was but one entrance to the room, and that from the front. The partition between the front and two rear rooms was of 1 x 12 inch boards covered with paper. Witness did not search this room but saw the shotgun the assistant

county attorney, Mr. Luton, brought from the room. On recall witness stated that they found the body of Nathaniel Pannell about 25 or 30 feet from the door to the Sholes part of the house. He identified a number of photographs of the house and grounds, and showing entrance to the respective apartments.

Dr. J. S. Chandler testfied that at about 5:15 p.m., on March 3, 1952, he examined the body of Nathaniel Pannell at the Provident Hospital, Muskogee, and found a gunshot wound or puncture in the forehead; that Pannell died at about 5:45 p.m., and the wound in the forehead was the cause of Pannell's death. The skull was not probed for discovery of a bullet.

L. L. Parks, police officer, testifed that he was driving alone in a police car when he got a call to go to defendant's address in Muskogee; that he found an old black hat about eight feet from the southwest corner of the house that had a hole in the front where the brim came out from the crown; that one could get a pencil through this hole. That hat was admitted in evidence after extensive identification. The officer found Mrs. Sholes in the rear apartment, but could not locate Sholes, so he returned to the police station, and on information telephoned in, witness and officer Ross Clayton at around 6:45 returned to search a house just north of the Sholes house and found the defendant in hiding and arrested him. · Witness stated that the defendant without any quizzing on his part, stated to him when they got in the police car: "Well I guess I am gone for a long time." And witness further stated, "And he said Pannell and he got into it and Pannell threatened to shoot him through a partition in the wall between the two apartments, with a shot gun."

R. T. Sypert, sheriff of Muskogee county, testfied that on March 3, 1952, he inspected the premises where the body of Nathaniel Pannell was found on the same day; that thereafter, about 7:00 p.m., he was in the captain's room of the Muskogee police department and Augustus Sholes was present, as was Mr. Luton, the assistant county attorney. That Mr. Luton told Sholes that he did not have to make a statement if he did not want to, but could do so. That Luton further told him that he was entitled to consult a lawyer, if he so desired. That the defendant freely made a statement of the purported facts of the death of Nathaniel Pannell, and Mr. Luton wrote the statement down. That a question would be asked·and answer given; that the completed statement was read back to the defendant, who then signed the same, and the sheriff testified that he then signed as a witness, as did others. He testified that the defendant was not threatened or promised any reward for making a statement or signing it, but that he freely told of the happenings related.

Counsel for the defendant objected to the admission of the statement in evidence by reason of the evidence showing that in addition to the sheriff and deputy there were a number of uniformed police officers present, and argued, in effect, that the atmosphere was therefore coercive and that the statement under such conditions could not be considered voluntary. The court admitted the statement, which reads:

"March 3. 1952.

"I, Augustus Sholes, give this statement to John D. Luton, ass't county attorney Muskogee County Oklahoma in the presence of R. T. Sypert Sheriff of Muskogee County, Oklahoma, and L. L. Parks Muskogee Police Department after I was informed of my rights and that I was entitled to call an attorney if I wanted to. I give this statement freely and voluntarily and I have not received any promises nor has there been any threats made to me.

"I had not been home since yesterday, March 2, 1952. I came home about 4 p.m. today. Mabel, my wife, told me that Nathaniel Pannell had been bothering her the night before and that Bessie Prince and Daisy Wofford· had thrown

him out of the house. About that time Nathaniel started cursing Mabel through the wall of the house from his room. I told him to stop it and behave himself. He told me to come outside and he would show me something. I got my gun and went outside to see him. He came out and began to curse me and I told him he shouldn't act like that but he kept it up, so I shot him. I killed him because he cursed me. I wasn't afraid of him. I took the gun back in the house and went to the toilet and hid.

"Nathaniel didn't make any move to hit me and didn't have his shotgun or any other gun that I saw.

"I give this statement freely and voluntarily. I have heard this statement read to me by Ronnie Rector, deputy sheriff, and it is true and correct."

This completed the evidence on behalf of the state, to which counsel for the defendant interposed a demurrer, which was overruled and exceptions allowed.

Sarah Muldrow, age 52, testified for the defendant. She stated that on the day Pannell met his death she lived next door east of defendant's house; that about a quarter to ten that morning she went over to defendant's house to borrow some soda; that defendant was not. at home, but his wife, Mabel, was there. While she was talking to the wife Nathaniel Pannell came in the room drunk. This was about 11 o'clock that morning; that he made a threat and used some vile language toward Mabel. Witness stated that she got up and left, and she never saw Pannell alive thereafter. She was not a witness to the fatal difficulty.

Mabel Sholes, age 42, wife of the defendant, was asked to tell the jury what happened after Sarah Muldrow came to her home that morning. She testified:

"Well, she came to my house to visit and I had already had my dinner on the fire cooking, and so Pannell he called from his room and asked me what did I have to eat and I told him I had some beans but I said they are not done. Well, we sat there quite a few minutes and Pannell comes out of his house and comes on around and opens my screen and walks right in and he said, 'God damn you, I am hungry'. He was drunk. He started to the kitchen and I said, 'My beans is not done.' He says, 'You are a God damned liar, and I will knock your God damned head off'. He was going to the kitchen and I told him not to go and he turned around. Sarah Muldrow got up and left. She could not stay, and left me there alone. After she left, I told him to go home, and he said he wasn't going no God-damned where, and I went to the door and called my land-lady."

Witness further stated that Daisy Wofford, her landlady, came over to see what the trouble was and told Pannell to come on over to her house and she would give him something to eat, and she shoved him on out the door. She said this all happened around noon that day. That her husband was not at home at the time, but he came about 2:30 o'clock that afternoon.

Witness further testfied that when her husband came home, she told him about her trouble with Pannell; that Pannell heard the conversation and spoke through the wall and said, "If you fool with me I will take my old scatter gun and I will shoot you through the wall." That her husband said, "No, don't do that, Pannell, meet me out doors." She testified that she didn't hear Pannell say anything to her husband, but heard the door open in Pannell's room. She said, "When the door opened Augustus got up, took his gun and walked outside of his door, and Pannell was meeting him around the corner of the house." She said that she didn't go out of the house; that after the shot was fired her husband came in and laid his gun on the dresser and then left and she didn't see him again until after he was arrested. This witness admitted that she had been drinking some that day, but said she was not drunk.

The defendant, Augustus Sholes, testified. He admitted that he had had a drink of liquor prior to coming home the afternoon of March 3, 1952. He testified that he was 59 years of age, was a veteran of World War I, stated that he had never been in trouble before; that the deceased was his second cousin and that they had never had trouble before the day of the shooting. Witness testified that he got home about 5 o'clock that afternoon, and had a conversation with his wife and found out about the trouble between her and Pannell. He was asked and aswered questions as follows:

"Q. Will you state what the conversation was? A. Oh, when I came in she was sitting on the bed, kind of with her head down and I asked her what was the matter with her. She said Nathan had been over there causing a disturbance. He came over there and made her cook him something to eat, and so I said, 'You ought to cut that out'—so he heard me through the wall. Then he began to abuse me. Q. What did he say to you? A. Well when he heard her tell me about him being over there, he says to me, he says 'Why that damn black son-of-a-bitch, I will take my gun and come over there and kill both of you.' Q. Did he say anything further A. I said, 'Nathan, what is the matter with you? Are you losing your mind? Are you crazy?' He said, 'Hell no, I am not crazy', and he got up and began walking around in the house, and when he got near the door, he says, 'Come on out doors, I will show you something.' So I got up and went on out, and he threatened to shoot through the wall."

Wintess further stated that he had seen a shotgun in Pannell's possession.

"Q. Did he have anything in his hand that you saw? A. No. I never saw nothing in his hand. Q. Did he make any move when you saw him? A. Yes. * * * Well, he was continuing cursing and he ran his hand in his pocket when he saw me and put his head down and kept coming. Q. Put his head down? A. And kept coming. Q. Which hand did he put in his pocket? A. His right hand. Q. What did you do? A. Well, then I shot him. Q. Why did you shoot him? A. Because I was afraid. Q. Afraid of what? A. Well, he had threatened to shoot through the wall before he come out. Q. I believe you said you didn't have any other entrance but that one? A. That is the only door I had and if I stayed in there and never came out he could have hemmed me up in there."

On cross-examination defendant testified that when deceased came around the corner of the house and faced him—"He put his hand in his pocket like he had a gun or something." He said, "Well, he had on an overcoat and his overcoat was over his hand." He stated that he was 20 to 25 feet from deceased when he shot him. He admitted that he did not see the deceased with a shotgun or other weapon in his hand when he came around the corner of the house. Defendant admitted that he had been drinking that day. Said he had one drink about an hour before he came home.

Thus the case closed, and counsel for defendant renewed their demurrer to the evidence, which was overruled.

We have carefully examined the instructions and find that the issues were correctly defined, and liberally favored the defendant in his theory of the case. No objections were interposed to any of the instructions given and no requested instructions were submitted by counsel for defendant.

The principal contention of error is the admission in evidence by the court of the statement the defendant made to the officers concerning the facts of the shooting of Nathaniel Pannell, and reduced to writing and signed by the defendant.

The facts surrounding the obtaning of the statement as related by the sheriff have been summarized above. When the defendant testified, he did not dispute anything the sheriff testified to concerning the obtaining of the signed statement. In fact, he did not categorically deny that anything in the written statement was

not as stated by him to the officers. He merely attempted to give a little .different shade to the facts just a few moments before and at the instant of the shooting. By cross-examination counsel for the defendant did show that the officer failed to warn the defendant that the statement, if he should make one, might be used against him, though they did advise him that he did not have to make a statement if he did not want to, and that he was entitled to talk to an attorney. But there is no contention of direct coercion, or threats or promises of reward.

It is seemingly the theory of the defense that by reason of the fact that at the time the assistant county attorney, Mr. Luton, questioned the defendant concerning the death of Nathaniel Pannell there were numerous uniformed officers present and that such fact alone was sufficient to put the defendant in fear, and was coercive. But the defendant did not so say when he testified. There was no evidence that he was panicky or nervous or afraid, but apparently he was freely getting a burden off his mind after having for a short time gone into hiding following the shooting.

Counsel cite the cases of Foster v. State, 79 Okla. Cr. 183, 152 P. 2d 929, Story v. State, 73 Okla. Cr. 273, 120 P. 2d 387, and Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015, 1018, as supporting his position. An examination of the facts in those cases will demonstrate that this court never went so far in holding inadmissible a confession or statement of a defendant under arrest as is now sought.

The county attorney, as we have often stated, should always caution a prisoner that any statement he might make could be used against him. It is not too clear when the defendant was advised that he could see an attorney, whether before the statement was made or after, but the state made a prima facie showing that the statement or confession in question was voluntarily made by the defendant without threats on the part of the officers or promises of any kind.

We can well conceive of situations where if a prisoner was surrounded by officers and subjected to constant and apparently aimless questioning and by demeanor, manner, gestures, side remarks, etc., he might become so confused as to tell the officers anything that might seem to please them. But here no showing by the defense was made to indicate any such conduct, or that the defendant in fact suffered frustration by reason of the questioning now complained of. No authority is cited that would support the proposition urged. The principle involved and here prevailing is well stated by a quotation from Bishop, in Williams v. State, supra, cited by defendant. where it is said:

" 'A defendant's confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth.' "

Counsel for the defendant contend that the court erred in overruling defendant's motion for a directed verdict, and that the evidence was insufficient to sustain the verdict.

As heretofore stated, the issues were fairly submitted to the jury. The case of Perez v. State, 51 Okla. Cr. 180, 300 P. 428, cited by defendant, by reason of variance in the facts, is not applicable to the within case. There the deceased chased defendant, cutting at and cutting defendant, who cut back and killed the deceased.

The jury in the within case considered whether it was necessary for the defendant to fire on the deceased at the time that he did and whether it was the deceased or the defendant who invited the other out into the yard. The deceased

was profane and under the influence of liquor, but had not harmed anyone and there was no evidence that he would do more than curse. As stated by this court in Lowrey v. State, 87 Okla. Cr. 313, 197 P. 2d 637, 645, as well as many other cases:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Criminal Court of Appeals will not interfere with verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

Counsel call our attention to the authority of this court to modify the punishment assessed, Tit. 22 O.S. 1951 § 1066, should the case be affirmed. Justification for modification is urged on the basis of the action of this court in Seals v. State, 54 Okla. Cr. 204, 16 P. 2d 885, where an eight-year sentence was modified to five years. A reading of the facts in that case, which we will not take up space here to repeat, will demonstrate that we would not be justified by such case in modifying the sentence here.

We have thoroughly considered modification. It is with mixed feelings of duty and sympathy that courts mete out justice. However guilty the person, it affords courts no pleasure in performing the duties imposed. It does cause deliberation.

But we find nothing that would justify this court in modifying the judgment and sentence in this case. Whiskey appears to have been the basic fact bringing about the conduct of all the parties concerned. Inhibitions were removed and the defendant killed his cousin with whom he had not had prior trouble. The trial judge apparently gave defendant the benefit of every circumstance favorable to him in view of the finding of guilt by the jury. The taking of human life cannot be treated lightly if civilization is to survive. It is the duty of the courts to so remind those who think otherwise, even in an instance that some might treat as small.

The judgment and sentence is accordingly confirmed.

JONES and BRETT, JJ., concur.